UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

v.                                                       Civil No. 00-10484
                                                         Hon. David M. Lawson

RICHARD BLI, ESTATE OF JAMES E. BLI,
deceased, and BLI FARMS,

                    Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The government, as plaintiff in this case, claims that the defendants, Bli Farms (a Michigan

co-partnership), Richard Bli, and the estate of James Bli, are liable for damages under the False

Claims Act, 31 U.S.C. §3729 *et seq.*, for making false statements to crop loss insurers, whose

obligations were underwritten by the United States through farm programs administered by the

United States Department of Agriculture, in support of loss claims under policies covering crop

years 1992, 1994 and 1995. The government contends that the defendants understated the volume

of potatoes produced in their fields on their proof of loss forms. The defendants deny these

allegations.    Trial began on November 7, 2006 before the Court sitting without a jury, and the

proofs concluded on November 9, followed by final argument on November 14, 2006. The Court

heard the testimony of six witnesses and received 215 exhibits. In addition, the parties stipulated

to introduce several deposition transcripts, including two volumes of a combined statement under

oath of Richard and Pearl Bli, and the depositions of Pearl Bli (four volumes), James Bli, Sr., and

Richard Bli (five volumes). The parties filed a stipulation of fact and law consisting of 87 separate

paragraphs. Initial and amended proposed findings of fact were filed, along with trial briefs. The

following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52, followed by its application of the governing law.

### Findings of Fact

Defendant Bli Farms is a Michigan co-partnership formed in January, 1992 by the individual defendants Richard Bli and James Bli, Sr., who are brothers. During the crop years at issue, Bli Farms was a family farming enterprise that engaged mainly in the production and marketing of potatoes for sale as table stock. Potatoes were their principal crop, generating the income essential to the success of their operation. They also grew corn, sugar beets and occasionally soybeans. Bli Farms sometimes trucked potatoes for other growers. Bli Farms also purchased potatoes from other growers for resale as table stock, and for sale as feed or other purposes. The farming operations were conducted from 101 Ridge Road, Bay City, Michigan, where the defendants had their office, their potato sorting and packing operations, potato storage facilities and equipment sheds. For the crop year 1992, the Blis owned approximately 350 to 400 acres of farmland and rented an additional 700 acres. The acreage the Blis owned increased to 440 acres of crop land in crop year 1995, while the acres they rented increased to approximately 1800.

In addition to the two partners, Richard Bli and James Bli, James's wife, Pearl Bli, participated in the family farming operations by helping James with his field work, working on the potato packaging line, and assisting Richard with office work. Their sons, James Bli, Jr., and William Bli, also worked full time in the farming operation, engaging in the production of the crops and in trucking.

The farming operation was the sole means of support for defendant James Bli and his wife Pearl for the years at issue. Defendant Richard Bli testified that during the years at issue he lived

-2-

with his mother and had his expenses covered by income that she received from Social Security checks and land rentals.  *See* Ex 247, August 18, 2005, Dep. of Richard Bli at 82-83.

During the years at issue, the defendants maintained a single deposit and checking account for the family farming operation.  All checks and receipts, including crop insurance indemnity checks, were deposited into that account.  The only exception to their practice of depositing all checks into their account were those checks endorsed to lenders to repay loans.  All expenses were paid from the account.  If a person they were doing business with wanted to be paid in cash, Richard withdrew the money from the account and paid them in cash.  Defendant James Bli took draws from this account to cover living expenses.

Bli Farms usually harvested their potatoes beginning in late July or early August and continued into November.  After harvesting the potatoes from their fields, they would truck the potatoes to their facility at 101 Ridge Road, where they would run the potatoes through a packing line for sorting, washing and bagging.  Potatoes that Bli farms harvested in August, September, and October were usually sorted, washed, bagged and sold right away because the warm weather typical of those months made it difficult to keep the potatoes cool in storage.

Field run or bulk potatoes, consisting of all the potatoes harvested from a field, contained various grades of potatoes, as well as dirt and stones.  When brought to the shed, the potatoes would be sorted by grade, with chef's and No. 1 potatoes being the superior grades that Bli Farms sold for table stock.  "No. 2" or "B" grade potatoes were smaller potatoes that could be sold for canning purposes.  Unclassified were the less desirable potatoes.  Defendant could sometimes sell these potatoes for human consumption or as animal feed.  Culls or pick-outs were rejected or spoiled

potatoes that Defendants dumped or delivered for use as animal feed.  Bli Farms mostly sold No. 1 white potatoes.

Richard Bli was solely responsible for the marketing and potato purchasing activities of Bli Farms.  He maintained the farm checking account, and kept the books and records.  He was responsible for Bli Farms' participation in the crop insurance programs, including the certifications of claims and maintenance of supporting records of their harvested production.  He provided the supporting information and caused the submission of Bli Farms' applications for disaster benefits from the USDA's Agricultural Stabilization and Conservation Service (ASCS) for the crop years 1992 and 1994, and for their 1997 application for a loan from the Farm Service Agency.  He made the final decisions regarding all crops that Bli Farms would plant for each of the crop years at issue, although he would discuss these matters with his brother, James Bli, and his nephews, William and James Bli, Jr.

Richard Bli conducted the defendants' potato marketing operations under assumed names, including "E.F. Bli & Sons," "Valley Potato Growers," "Mid-State Potato Growers," "Potatoes Plus of Michigan," "Saginaw Potato Growers," "Suttons Bay Potato Growers," and "Zeller Farms." Richard Bli testified that he used assumed names in marketing the defendants' potatoes for many reasons, including getting around negative associations some customers had with a name the defendants used to sell them potatoes that turned out to be rotten, or to market to different customers operating out of the same terminal who wanted brands to market that were distinct from their competitors.  However, he did not use the assumed names in any particular pattern or order; he testified that he used an assumed name whenever he felt like using one.  Ex. 253 at 88.  The

defendants also used the assumed name, "Bli Trucking," which they placed on the sides of their trucks.

The defendants purchased crop loss insurance that would pay an indemnity payment for crop failure caused by certain natural perils. The insurance policies were written to cover crop years 1992, 1994, and 1995, among other years. The insurance policies were issued by private companies for the years 1992 (CIGNA, through its subsidiary Rain and Hail Insurance) and 1995 (Rural Community Insurance Service), but the policies were underwritten and funded by the United States Department of Agriculture and the government reimbursed the indemnities paid. In crop year 1994, the insurance was provided directly by the government through the Federal Crop Insurance Corporation. The insurance policies are written is such a way as to establish a benchmark for production from acreage on an annual basis. Based on historical production records, an average yield per acre is determined; then certain coverage options are elected by the farmer to arrive at a guaranteed yield per acre. If the actual production falls below the guarantee as a result of a covered peril (such as wind, excess rain, drought, etc.), coverage is triggered and the farmer may claim a loss. Under the terms of the policies involved in this case, the farmer must insure all fields farmed in an individual crop within a single county, but the farmer may segregate each field into optional units, provided he keeps written, verifiable records of the planted acreage and production from each unit. If he elects that option, then a guarantee is established for each field, and actual production from that field falling below the guarantee will trigger coverage even if the other fields yield above guarantees. However, if the farmer fails to keep separate records documenting production from each unit, all the units in a county are collapsed into a single unit and the matter is treated as one claim for that crop year.

The Court finds that the defendants failed to keep written, verifiable records documenting production from each individual unit for the crop years 1992, 1994, and 1995. Therefore, the optional unit structure will not be applied in analyzing the clams presented.

Richard Bli prepared and submitted Bli Farms' claims for crop insurance indemnities. He kept the records to support the claims and he alone dealt with the adjusters. James Bli, Sr. was not involved in preparing or submitting the claims, claiming that he was unaware that papers had to be filed for crop insurance. However, he later stated that he relied on Richard to fill out the forms for crop insurance. *See* Ex. 250 at 63-64. He expressly authorized Richard to submit Bli Farms' claims for crop insurance indemnities for the 1995 crop year. *See* Ex. 58 (Crop Year 1995 RCIS MPCI Application, with signature authorization from James Bli). Although he stated that he was unable to remember whether Bli Farms received monies from crop insurance, his brother and co-partner, Richard Bli, stated that James was aware that Bli Farms was receiving crop insurance indemnities for the crop years at issue. *See* Ex. 247, August 18, 2005 Dep. of Richard Bli at 88.

Acting through Richard Bli as authorized by James Bli, Bli Farms provided the crop insurance adjuster invoices for the sale of packaged potatoes to establish the total production for each insured unit of planted acreage. Using these invoices, the adjuster would prepare the claim for that unit by listing thereon the specific invoices and the weight of the sold packaged potatoes. Richard Bli then signed each claim on behalf of Bli Farms, and by signing he certified the harvested production shown by the invoices he provided to the adjuster. For the crop year 1992, the defendants submitted claims on ten optional units and received a total indemnity of $130,999. For crop year 1994, the defendants submitted claims on thirteen optional units, twelve of which are in issue, and received an indemnity of $383,822. For crop year 1995, the defendants submitted claims

-6-

on their thirteen optional Bay County units and received an indemnity of $382,357. The United States Government, through its agency, the FCIC, paid or reimbursed these indemnities.

The defendants made claims certifying that they produced the following yield of potatoes from all the their combined units in Bay County in the respective crop years:

|      |             |
|------|-------------|
| 1992 – | 21,854 cwt |
| 1994 – | 20,902.5 cwt |
| 1995 – | 38,037 cwt |

According to the defendants, these production totals represent only No. 1 white potato production.

The government has obtained credible proof that the defendants sold potatoes in excess of their reported production. The parties agree that the records analyzed represent all of the defendants' extant potato sales invoices and potato purchase records. The government analyzed the defendants' sales invoices because the defendants used sale invoices to document the harvested production they certified on their MPCI claims. Using a spreadsheet format for each of the crop years in issue, the government entered the quantity of potatoes, description, and nature of the transaction for each discrete quantity of potatoes listed on each invoice or purchase record. After lengthy discovery, the parties executed a stipulation wherein they agreed that each of the entries on the spreadsheets accurately reflects the transaction described in the referenced business records, with exception of certain entries printed in red ink. *See* Ex. 100, Spreadsheet Stipulation. The sales reported in the respective crop years are as follows:

|      |             |
|------|-------------|
| 1992 – | 146,353.25 cwt |
| 1994 – | 139,671.8 cwt |
| 1995 – | 252,358.01 cwt |

The parties acknowledge that these figures represent all potatoes sold by the defendants, including grades and kinds other than No. 1 white potatoes.

-7-

The government contends that the relatively larger volume of sold potatoes proves that the defendants actually grew more potatoes than they represented in their crop loss insurance claims. The government insists that the Blis under-represented their yield in order to fraudulently obtain crop loss indemnity payments to which they were not entitled.

The defendants contend that the difference between the amounts they represented as produced in their insured fields and the amount sold for the respective years can be explained mostly by the fact that the defendants pack and sell potatoes produced by other growers in addition to the potatoes they themselves produce. They have come forward with invoices for potatoes purchased from other growers; they say that they packed out and sold those potatoes, and the government ought not to count those sales as potatoes produced in the insured fields.

The government responds by acknowledging that some of the sold potatoes came from other growers, but it states that some of the other documented purchases cannot be used to reduce the total amount sold because those potatoes were used as seed potatoes and were never sold. Moreover, the government observes that even if all these purchases are accounted for, they do not reduce the amount of sold potatoes documented by the government to the amount that the defendants certified as having been produced in the respective years. There still remains a quantity of potatoes that the Blis sold that cannot be accounted for in the documented purchases of potatoes for packing; that amount, the government insists, came from the Blis' own production from their insured fields.

The defendants claimed at trial that the absence of documented proof of purchased packing potatoes can be explained in two ways. First, they maintain that records existed at one time showing packing potato purchases, but those records were stolen on February 21, 1996 when there was a burglary in their office at 101 Ridge Road, Bay City, Michigan. Only an office safe was stolen. The

-8-

defendants contend that the safe contained certain business records.  Second, the defendants claim, apparently for the first time at trial, that they received loads of rejected chip potatoes from other growers for which they paid nothing and produced no documentation, and they were able to repackage and sell these rejected produce as table stock.

As for the seed potatoes, the defendants claim that they purchased the overstock from seed potato growers, and although the invoices identify those potatoes as seed potatoes, the defendants actually packaged and sold them as table stock.  The Court finds that this claim is not credible for the following reasons: First, based on the acreage planted by the defendants, the amount of seed potato purchases documented in the records does not exceed the amount needed to plant the fields in the respective crop years, based on the testimony of Richard Bli that 11.25 to 15 cwt per acre was required.  And that testimony understates the per-acre planting volume that was represented in the disaster relief application for 1994 signed by Richard Bli, wherein he states a seeding rate of 19 cwt per acre.  *See* Ex. 319.  Second, the dates of the invoices for seed potatoes correspond roughly with the planting season in the subsequent respective crop years.

As for the alleged stolen records, the Court does not find that this claim is fully credible. First, Richard Bli testified at a deposition that he wrote down the potato acquisitions from other growers and put the papers in folders for each crop year, together with sales documents.  *See* Ex. 247 p. 65-68.  Some of those sales documents for the years in question are here in evidence.  Richard Bli never directly stated that he kept the notes regarding purchased potatoes in the safe.  *See* Ex. 247 p. 65-68.

Second, Richard Bli testified that the invoices in the stolen safe were duplicates of invoices stored elsewhere in the office.  *See* Ex. 247 p. 71-72.  Therefore, the "missing" invoices are otherwise accounted for.

Third, Richard Bli's testimony about which records were stored in the safe and which records were stored in file cabinets is internally inconsistent and contradictory.  In addition, Richard Bli stated that there were records of yield and acreage stored in the stolen safe that he would have had to use to prepare FSA Certification of Disaster, but he used those records to complete the certifications over a year after the theft was reported to the police.

Based on the stipulated spreadsheets, Ex. 97, 98 and 99, there is no interrupted pattern of purchases that likely would emerge if there were missing records that could not establish purchases in a gap period.  That leads the Court to conclude that there are no missing records concerning packing potatoes.

As for the repackaging of rejected chip potato loads, the Court finds that on at least one occasion a grower delivered such a load to the Bli Farms processing facility.  Paul Groulx testified that sometime in the mid-1990s he brought a truck containing 10,000 to 11,000 bags of chip potatoes to the Bli facility.  That represented approximately 11,500 cwt.  The load was rejected by the buyer, and Groulx recovered crop insurance for the potatoes so he could not accept payment for them.  But he needed someone to offload them from his trucks, and the Blis had the proper equipment.  However, the Court does not believe that the Blis could have recovered any significant volume of potatoes to repackage and sell as table stock.  First, chip potatoes are not the same quality as No. 1 white potatoes.  Second, Groulx testified that as little as 7% to 8% and as much as 15% of the load was determined to be unusable by the chip processor.  Third, there is no credible proof that this type

-10-

of event occurred more than the single time described by Mr. Groulx.  Fourth, Groulx testified that chip processors reject loads for a variety or reasons, including spoilage and disease.  Although there was no proof as to the exact reason Groulx's load was rejected, it is reasonable to conclude that other growers finding a need to offload rejected loads would be carrying potatoes that were unusable for any purpose, and certainly not for No. 1 white or other table stock.

The Court finds, therefore, that the defendants' explanations for the discrepancies between the amounts of potatoes sold and the amounts produced in the respective years are not credible.  Rather, the logical explanation for the source of the sold potatoes is the Blis' own production.  Based on the stipulated spreadsheets and the other evidence discussed herein, the Court finds that the defendants significantly under-reported the quantity of potatoes produced on the proof of loss forms submitted in support of their crop loss insurance claims in crop years 1992, 1994 and 1995.

There is additional evidence that tends to prove that the defendants under-reported their potato production in the years at issue.  Richard Bli's certifications of Bli Farms' potato yields for the crop years 1992, 1994, and 1995 in connection with its application to the Farm Service Agency (FSA) for an emergency loan to finance operating losses for their 1996 crop year show substantial sold production in excess of that certified on the insurance claim forms for those years.  *See* Ex. 199. The defendants used records that they kept of their harvested yields per acre to provide the yields and acreage to which they certified in their initial Certification of Disaster Losses to FSA.  Based on their actual records, they certified the following potato acreage and yields for the crop years at issue in their initial Certification of Disaster Losses to the FSA:

| Crop Year 1992 | 501 acres | 165 cwt./acre | Total: 82,665 cwt |
| Crop Year 1994 | 981 acres | 196 cwt./acre | Total: 192,276 cwt |
| Crop Year 1995 | 1,403 acres | 152 cwt./acre | Total: 213,256 cwt |

-11-

The defendants revised their Certification of Disaster Losses twice to conform with yields and acreage that they had previously certified to the Agricultural Stabilization and Conservation Service (ASCS) to obtain disaster benefits for crop years 1992 and 1994. *See* Exs. 258, 350, 351; Ex. 254, November 29, 2005, Dep. of Richard Bli at 22-23. On their Second Revised Certification of Disaster Losses, Richard Bli and James Bli certified the following potato acreage and yields:

| | | | |
|---|---|---|---|
| Crop Year 1992 | 527 acres | 119 cwt./acre | Total: 62,713 cwt |
| Crop Year 1994 | 981 acres | 21.56 cwt./acre | Total: 21,150.36 cwt |
| Crop Year 1995 | 1,403 acres | 152 cwt./acre | Total: 213,256 cwt |

*See* Ex. 202.

The defendants initially certified yet another yield per acre for their 1992 potato crop, 43 cwt., when, acting through Richard Bli, they filed a claim for 1992 disaster benefits with the ASCS. Based on the ASCS Bay County Committee's knowledge of the defendants' 1992 potato crop and the defendants' records, the County Committee increased Bli Farms' 1992 potato yield from 43 cwt./acre to 119 cwt./acre in determining their disaster benefits. Richard Bli stated that the 119 cwt./acre yield determined by the Bay County Committee was accurate. *See* Ex. 254, November 29, 2005 Dep. of Richard Bli at 17. To explain the discrepancy between the 43 cwt./acre yield they initially certified to ASCS to obtain 1992 crop year disaster benefits and the yield of 119 cwt./acre determined by the ASCS County Committee, Richard Bli stated that the latter yield included potatoes that later spoiled. He changed the defendants' 1992 crop year potato yield on the revised Certification of Losses from 165 cwt./acre to 119 cwt./acre to match what he had certified to ASCS for disaster benefits.

The defendants explain the wide discrepancies between the potato yields they certified to FSA in support of their loan application and the potato yields they certified to obtain crop insurance

indemnities for the same crop years as due to differences in the nature of the yields being reported. They claim that the yields they certified to FSA included everything that they harvested off the fields, while the yields that they certified to crop insurance included only the No. 1 potatoes that they were able to sell because they had a quality option as part of their crop insurance policy. *See* Ex. 203, Bli Farms' submission to FSA, at 37-42 and 43-48; Ex. 230, Responses to Interrog. Nos. 7, 8 and 9; Ex. 255, November 30, 2005 Dep. of Richard Bli at 31-33.

The Court finds that this explanation does not suffice to explain the discrepancy between what the defendants certified to crop insurance as their sold production and their sold production as shown by the government's analysis: the analysis of the defendants' potato sale invoices and purchase records shows that most of the defendants' unaccounted for reported sold production consisted of No. 1 white potatoes. The defendants acknowledge that they sold mostly No.1 potatoes during the crop years at issue. Moreover, the defendants did not report any purchases of potatoes for resale in their quarterly reports they were required to file with the Michigan Potato Industry Commission for the crop years at issue. These reports required a potato grower or shipper to certify the amounts and purchasers of Michigan grown potatoes he sold, and the sources of these potatoes, to remit assessments based on these amounts, and to maintain permanent records of all purchases, sales and shipments of potatoes. *See* Mich. Comp. Laws § 290.424(6).

Richard Bli filed reports for the first and second quarters of the 1992 crop year, Exs. 204 and 205; for the first, second and third quarters of crop year 1994, Exs. 206, 207 and 208; and for the first and third quarters of crop year 1995, Exs. 209 and 210. None of these quarterly reports show the defendants as having received potatoes from other growers for resale. The defendants reported only their own production, which they certified as being sold to one marketing outlet in modest

-13-

amounts. The defendants also filed one annual grower's report, for the 1995 crop year. They certified selling a total of 30,690 cwt. to "A.B.C. Marketing plus Repack," which quantity is the sum of the amounts they reported as their own sold production on their Quarterly Reports to the Michigan Potato Industry Commission for that crop year. *See* Exs. 209, 210 and 211. The total amount of potatoes sold that they reported to the Michigan Potato Industry Commission for crop year 1995 is less than the sold production of 38,037 cwt. that they certified to crop insurance for that crop year, according to Exhibit 80, a Production and Yield Report.

When asked why Bli Farms did not report all the sales of potatoes shown by their spreadsheets on Bli Farms' Michigan Potato Industry Commission Quarterly Reports, Richard Bli stated that he put down figures to satisfy the Commission because he knew there would not be any consequences for failing to file an accurate report. Ex. 253, November 22, 2005 Dep. of Richard Bli at 16-18. He made only "minimized' reports and paid what he wanted to pay of the assessments. Ex. 253, at 23-24; Ex. 254, November 29, 2005 Dep. of Richard Bli at 105.

Finally, the losses that the defendants reported to crop insurance are inconsistent with the substantial increases in their planted potato acreage during the years at issue. For every crop year from 1992 through 1996, the defendants claimed losses on their potato crop and collected crop insurance, reporting average yields per planted acreage of:

Crop year 1992:      41 cwt./planted acre
Crop year 1993:      173 cwt./planted acre[1]
Crop year 1994:      22 cwt./planted acre
Crop year 1995:      29 cwt./planted acre

The defendants admitted that they had crop insurance losses for their 1991 crop year. Notwithstanding these losses, their potato acreage expanded as follows:

─────────────────

[1]Answer to Amended Complaint, Paragraphs 30 and 33.

-14-

Crop year 1991        415 acres
Crop year 1992        527 acres
Crop year 1993        694 acres
Crop year 1994        981 acres
Crop year 1995        1403 acres (including Saginaw County)
Crop year 1996        1453 acres (same)

The defendants reported average yields per planted acre to crop insurance that were approximately 80 to 90% less than what the other farmers in Bay County were obtaining, as shown by the Bay County averages published by the National Agricultural Statistics Service Information:

|  | NASS | Bli Farms |
|---|---|---|
|  | Avg. Bay County | MPCI Reported Avg. |
| Crop Year 1992 | 265 cwt. | 41 cwt. |
| Crop Year 1994 | 220 cwt. | 22 cwt. |
| Crop Year 1995 | 275 cwt. | 32 cwt. |

*See* Ex. 214, National Agricultural Statistics Service Information for Bay County.

Their other crops could not have generated sufficient income for this expansion because, according to Exhibits 40 (CY 1992 CIGNA Claim Summary), 57 (CY 1994 Policy Holder Information Report), and 80 (CY 1995 Bay County Production and Yield Report/Actual History), the defendants claimed losses for crop insurance purposes on these crops as well.

The defendants' guaranteed yields per planted acre under their Bay County crop insurance policies for the years at issue were well below the county averages. *See* Exs. 101, 103 and 105, Indemnity Summaries. These relatively low guaranties compared to the yields per planted acre that the average Bay County potato farmer was harvesting, *see* Ex. 214, render it unlikely that the defendants could triple their planted potato acreage while harvesting only the dismal yields they reported to crop insurance and receiving indemnities based on guaranties that were 30% to 40% of the average county yields. Although alone, this conclusion does not establish fraudulent under-reporting of production, it certainly is part of the circumstantial case brought forth by the

-15-

government and corroborative of the strong inference of under-reporting compelled by the sales information summarized on the spreadsheets. The unlikelihood of this expansion substantiates the documented sales figures and fortifies the government's claim that the amounts solely came from the Blis' own production rather than produce obtained from other growers.

The Court accepts the stipulation of facts submitted by the parties on November 6, 2006 (dkt #124) and incorporates them into the record and these findings of fact.

The government has taken the position that the claims for each of the respective years must be treated as a single claim because of the failure of the defendants to comply with the record-keeping requirements of the policies for coverage on an optional unit basis. The Court agrees. As a consequence, the production of each unit is collapsed into a single production total for all the fields in the county, and the guarantees for each optional unit are totaled. The government's expert, Mark Price, testified that when the unreported sold production is factored into the claim formula, the volume of potatoes produced in crop years 1992 and 1995 exceeds the guarantees in those years even if the defendants were to prevail on the disputed entries on the stipulated spreadsheets for those years, Exhibits 97 and 99. Therefore, the Court finds it unnecessary to resolve the disputed entries for those years.

Consequently, even if all disputed entries for the 1992 crop year are found in the defendants' favor, the stipulated spreadsheets establish that the defendants' had unreported sold potato production of 41,806 cwt., of which 30,964 cwt. were No. 1 white potatoes for the 1992 crop year.

As for the 1994 crop year, the Court has reviewed the disputed entries and finds that the government has proved by a preponderance of evidence that each of the matters must be resolved in favor of the government based on the evidence referenced below:

-16-

Entry 7229:  The Dennis Hanson invoice dated May 5, 1995 (Ex. 124) establishes that the defendants purchased 213 cwt. of Yukon seed potatoes for planting.  (Exs. 124, 123.)

Entry 7235:  Antigo Potato Growers Invoice No. 435-95 (Ex. 127) establishes that the defendants purchased 445 cwt. of seed potatoes for planting.  (Exs. 127, 128.)

Entry 7236:  Antigo Potato Growers Invoice No. 436-95 (Ex. 131) establishes that the defendants purchased 389.20 cwt. of seed potatoes for planting.  (Exs. 131, 132.)

Entry 7241:  Antigo Potato Growers Invoice No. 472-95 (Ex. 135) establishes that the defendants purchased  437.60 cwt. of seed potatoes for planting. (Exs. 135, 136.)

Entry 7242:  Antigo Potato Growers Invoice No. 485-95 (Ex. 139) establishes that the defendants purchased 450 cwt. of seed potatoes for planting.  (Exs. 139, 140.)

Entry 7243:  Antigo Potato Growers Invoice No. 488-95 (Ex. 142) establishes that the defendants purchased 470 cwt. of seed potatoes for planting.  (Exs. 142, 143.)

Entry 7245:  Antigo Potato Growers Invoice No. 503-95 (Ex. 145) establishes that the defendants purchased 401.6 cwt. of seed potatoes for planting.  (Exs. 145, 146.)

Entry 7259:  Antigo Potato Growers Invoice No. 429-95 (Ex. 148) establishes that the defendants purchased 433.20 cwt. of seed potatoes for planting.  (Exs. 148, 149.)

Entry 7260:  Antigo Potato Growers Invoice No. 499-95 (Ex. 151) establishes that the defendants purchased 445 cwt. of seed potatoes for planting. (Ex. 151.)

Entry 7806: The quantity of potatoes the defendants purchased from Best Quality is 418.60 cwt., as evidenced by Best Quality Invoice 3040 (Ex. 154) and Bli Farms' billing statement (ex. 153). (Exs. 153, 154.)

Entry 7807:  The quantity of potatoes the defendants purchased from Best Quality is 402.7 cwt.,  as evidenced by Best Quality Invoice 3042 (Ex. 156) and the Bli Farms billing statement (ex. 153).  (Exhibits 153, 156.)

Entry 7824:  The defendants did not purchase 429.20 cwt. of potatoes, as a weigh ticket is not an invoice substantiating the purchase of potatoes.  (Exs. 386, 158 and 159.)

Entry 9903:  Bli Farms sold 180 cwt. of potatoes to Corcoran as established by the defendants' invoice number 9903.  (Exs. 162, 163 and 164.)

Based on the stipulated spreadsheets and the above findings, the defendants had unreported sold potato production of 31,881cwt. for crop year 1994.  Of the 31,881 cwt. in unreported sold production, 24,564 cwt. were No. 1 white potatoes for the 1994 crop year.

Even if all disputed entries for the 1995 crop year are found in the defendants' favor, the stipulated spreadsheets establish that the defendants' had unreported sold potato production of 52,933 cwt. for crop year 1995, of which 23,264 cwt. were No. 1 white potatoes for the 1995 crop year.

## Conclusions of Law

The False Claims Act provides:

> Any person who . . . (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person."

31 U.S.C. § 3729(a)(1) & (2).  The United States, as the plaintiff, bears the burden of proving by a preponderance of the evidence that the defendants violated the False Claims Act. 31 U.S.C. §3731(c).  A preponderance of the evidence is "such evidence as, when considered and compared

-18-

with that opposed to it, has more convincing force and produces in [one's] mind[] belief that what is sought to be proved is more likely true than not true." *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 446 (6th Cir. 2005).

To establish a violation of Section 3729(a)(1) of the FCA, the United States must prove: (1) the defendant presented a claim for payment or approval to the United States Government; (2) the claim was false or fraudulent; and (3) the defendant acted knowingly. *United States ex rel. Schell v. Battle Creek Health System*, 419 F.3d 535, 538 (6th Cir. 2005). (Stipulation of Facts and Law, at ¶75.) To establish a violation of Section 3729(a)(2), the United States must prove that (1) the defendant made, used or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; and, (3) the defendant acted knowingly. *Wilkins ex rel. United States v. State of Ohio*, 885 F. Supp. 1055, 1059 (S.D. Ohio 1995).

A person acts "knowingly" for purposes of the False Claims Act if he or she (1) acts with actual knowledge; (2) acts in deliberate ignorance; or, (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. §3729(b). The plaintiff is not obliged to prove the specific intent to defraud on the part of the defendants. *Ibid.*

The Court finds that defendants Bli Farms and Richard Bli presented or caused to be presented to the United States for payment each of the crop insurance claims at issue, which the government and the Court treat as a single claim for each of the three crop years remaining at issue in this case because of the failure to abide by the requirements of the insurance policies for maintaining coverage on the optional units. Defendants Bli Farms and Richard Bli made, used or caused to be made or used records and statements of their sold potato production to procure payment

-19-

or approval of payment by the United States of the claims for each of the three crop years remaining at issue.

The defendants' certifications of Bli Farms' potato production were material to the United States' payment or reimbursement of the crop insurance indemnities that the defendants received for the three claims at issue. The claims were false because Bli Farms had substantial unreported sold production for each of the crop years, 1992, 1994 and 1995. Because defendant Richard Bli deliberately made statements on other documentation that the production volume was greater than that asserted in the proof of loss forms, and due to his admitted practices of monitoring the production of potatoes from the fields they maintained, the Court finds that Richard Bli had actual knowledge of the true production totals. The Court finds, therefore, that he knowingly made the false claims for indemnity and the statements of potato production in each of the crop years 1992, 1994, and 1995.

Defendants Richard Bli and Bli Farms, a Michigan co-partnership, acting through Richard Bli, a partner, violated both Section 3729(a)(1) and (2) of the False Claims Act in submitting the false claims and the false certifications of Bli Farms' harvested potato production to cause these false claims to be paid. The policies for the years at issue were in Bli Farms' name, the production insured was Bli Farms' production, the false claims were filed on behalf of Bli Farms and false statements of Bli Farms' production were made to procure payment of the three false claims paid to Bli Farms.

James Bli was a partner in Bli Farms and his estate is liable jointly and severally for any judgment against Bli Farms for violations of the False Claims Act pursuant to Mich. Comp. Laws §§ 449.13 and 449.15. Richard Bli was a partner in Bli Farms and he is liable jointly and severally

-20-

for any judgment against Bli Farms for violations of the False Claims Act pursuant to Mich. Comp. Laws §§ 449.13 and 449.15.

The defendants are also liable to the United States for breach of the insurance contracts. The United States has proved that Bli Farms had crop insurance policies for its potatoes for the crop years 1992, 1994, and 1995, the terms of the contract required Bli Farms to report all harvested potato production and provided that indemnities would be paid only if the production fell below the guarantees, Bli Farms failed to report all of its harvested production on its indemnity claims for these crop years and was not entitled to indemnities, and the United States was injured as a consequence of these breaches by paying out indemnities totaling $897,188, $704,640 of which Bli Farms was not entitled to.

In addition, the defendants are liable to the United States for payments made to them by mistake of fact in the amount of $704,640, representing the indemnities the United States overpaid Bli Farms either directly or by reimbursement. The United States has shown that it paid crop insurance indemnities overpayments totaling $704,640 to Bli Farms for the crop years 1992, 1994 and 1995, under the belief that Bli Farms was entitled to these indemnities based on the harvested production it reported on its crop insurance claims. The analyses of Bli Farms' business records discussed above establishes that this belief was erroneous. This erroneous belief that Bli Farms' harvested production was below its guaranties was material to the United States' decision to pay or reimburse the indemnities Bli Farms received by mistake.

## Damages

### 1992 Crop Year

This Court finds that, for the 1992 crop year, the defendants produced and sold at least approximately 63,660 cwt. of potatoes, of which they reported 21,854 cwt. to crop insurance. Of

the total potatoes produced by Bli Farms, at least 63,660 cwt. are identifiable as No.1 white potatoes. Because Bli Farms failed to report all of its actual sold production for each optional unit, it was not in compliance with the Optional Unit Division Guidelines. *See* Exs. 13, 17.  Consequently, its insured acreage in Bay County, Michigan is treated as a single unit.  Bli Farms failed to have the grade inspections required by the terms of the quality option; therefore, according to the insurance contract, one hundred percent of the gross weight of their harvested production is used to determine their production to count.

Bli Farms' actual total sold potato production for crop year 1992 exceeded the production they certified to crop insurance.  Had Bli Farms reported their total production, it would not have received an indemnity for their 1992 potato crop because its actual production exceeded its total production guarantee of 49,455 cwt.  By submitting the ten production worksheets wherein it understated its production, Bli Farms falsely claimed and fraudulently obtained $130,999 in crop insurance indemnities to which it was not entitled.

### 1994 Crop Year

This Court finds that for the 1994 crop year, Bli Farms produced and sold at least approximately 52,783 cwt. of white potatoes, of which it reported sold production of 20,903 cwt. to crop insurance. The total white potatoes that Bli Farms produced for 1994 includes appraised unharvested production of 274 cwt. as well as harvested sold production of 52,783 cwt.  Of the total white potatoes produced and sold by Bli Farms, approximately 45,466 cwt are identifiable as No.1 white potatoes. *See* Ex. 107, OIG Potato Production Summary; Ex. 108, Summary and Comparison.

Because Bli Farms failed to report all of its actual sold production for each optional unit, it was not in compliance with the Optional Unit Division Guidelines.  Consequently, its insured acreage in Bay County, Michigan is treated as a single unit.  Bli Farms failed to have the grade

-22-

inspections required by the terms of the quality option; therefore, one hundred percent of the gross weight of their harvested production is used to determine its production to count.

The defendants' actual total production of 53,057 cwt. (including appraised unharvested production) exceeded the production they certified to crop insurance by at least 31,881 cwt. Based on the information Bli Farms certified in their Acreage Report, FCIC determined a total guarantee on all thirteen insured potato units of 85,147 cwt. for the 1994 crop year. *See* Ex. 43, FCIC Summary of Coverage. Had Bli Farms reported its total production of 53,057 cwt., it would have been entitled to receive a crop insurance indemnity of only $192,538. By submitting the claim worksheets wherein it understated its production of No. 1 white potatoes, Bli Farms falsely claimed and fraudulently received indemnity overpayments of $191,284.

### 1995 Crop Year

This Court finds that, for the 1995 crop year, the defendants produced and sold at least 92,913 cwt. of potatoes, of which they reported 39,980 cwt. of harvested and appraised production to crop insurance. Of the total potatoes produced and sold by Bli Farms, at least 92,913 cwt. are identifiable as No.1 white potatoes.

Because Bli Farms failed to report all of its actual sold production for each optional unit, it was not in compliance with the Optional Unit Division Guidelines. Consequently, its insured acreage in Bay County, Michigan is treated as a single unit. Bli Farms failed to have the grade inspections required by the terms of the quality option; therefore, one hundred percent of the gross weight of its harvested production is used to determine their production to count.

Bli Farms' actual total production to count exceeded the production they certified to crop insurance. Had Bli Farms reported its total production, it would not have received an indemnity for their 1995 potato crop because their actual production exceeded its total production guarantee of

-23-

88,899 cwt. By submitting the thirteen Production Worksheets wherein it understated its production, Bli Farms falsely claimed and fraudulently obtained $382,357 in crop insurance indemnities to which it was not entitled.

### Conclusion

On account of the defendants' violations of 31 U.S.C. §3729(a)(1) and (2), each is jointly and severally liable to the United States for $704,640 in single damages, representing the indemnities the United States Government paid or reimbursed in excess of the indemnities actually owed for these three false claims, to be trebled, for total damages of $2,113,920, and a penalty of $5,000 for each of the three false crop insurance claims for a total penalty of $15,000.

The defendants also are liable for the costs incurred by the government in prosecuting this action. 31 U.S.C. § 3729(a) (stating that "[a] person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages").

Judgment will enter accordingly.

It is so **ORDERED**.

s/David M. Lawson
DAVID M. LAWSON
Dated: November 15, 2006                    United States District Judge

<div style="border:1px solid; padding:10px;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney of record herein by electronic means or first class U.S. mail on November 15, 2006.

s/Felicia M. Moses
FELICIA M. MOSES

</div>

-24-